COMMONWEALTH *VS.* LABOR RELATIONS COMMISSION.

No. 01-P-1381.

Suffolk. June 6, 2003. - April 16, 2004.

Present: BECK, KASS, & DOERFER, JJ.

*Department of Mental Retardation. Labor,* Collective bargaining. *Civil Service,* Collective bargaining.

The Department of Mental Health (department) violated G. L. c. 150E, § 10(a)(1) and (5), when it transferred responsibilities formerly performed by certain residential supervisors to program managers without giving the residential supervisors' union notice and an opportunity to bargain, where the transfer of responsibility constituted the transfer of bargaining unit work to nonbargaining unit employees; where the transfer of bargaining unit work, even when accompanied by no apparent reduction in the total number of bargaining unit positions, constituted a detriment to the bargaining unit because it could result in the eventual elimination of the bargaining unit through gradual erosion of bargaining unit duties; and where there was no question that the department did not recognize its duty to give the union notice of the change and an opportunity to bargain. [833-835]

APPEAL from a decision of the Labor Relations Commission.

*Julian T. Tynes* for the plaintiff.

*Marjorie F. Wittner* for the defendant.

BECK, J. The Alliance, AFSCME/SEIU, Local 509 (union), claims that the Department of Mental Retardation (department) violated G. L. c. 150E, § 10(*a*)(1) & (5), by transferring bargaining unit work to nonbargaining unit employees without giving the union notice and an opportunity to bargain. We agree.

*Factual and procedural background.* In 1995, for reasons related to service delivery and the condition of the building, the department closed the J.T. Berry Center, a residential program in the geographic area designated as Region III. Sixty of the Berry Center residents elected to move to State-operated community residences. To accommodate them, the department cre-

ated eleven new four-person homes and added two eight-person duplexes. It is the organizational hierarchy in the new four-person residences that is at issue here.

Before the Berry Center closed, Region III had thirteen eight-person community residences. Among the staff at each residence were residential supervisors, including residential supervisor Is (RSIs) and residential supervisor IIs (RSIIs), and program managers (PMs). The residential supervisors, members of the union, "were responsible for the day-to-day operation of the homes." Their duties were considered to be house-specific. The RSIIs supervised the RSIs. The PMs, who are not members of the union, had general oversight over residences assigned to them, including direct supervision of RSIIs and indirect supervision of RSIs.

After concluding that the new four-person homes did not require the same staffing levels as the eight-person homes, the department assigned only RSIs to the four-person residences. The supervisory functions formerly provided by RSIIs were then provided by program manager IIIs (PMIIIs), nonunion positions created in 1993 when plans for closing the Berry Center were proceeding.

In response to these changes, the union filed a grievance with the Labor Relations Commission (commission), challenging the transfer of supervision of RSIs from RSIIs to PMIIIs. An administrative law judge (ALJ) concluded that "the only [RSII] duties that [were] clearly transferred to program managers in four-person homes [were:] [1] the completion of [employee performance review forms] for [RSIs], [2] the assignment of duties to [RSIs] and [3] the completion of work schedules for [RSIs]." The ALJ found that although "the Union . . . suffered some adverse ramifications from the department's creation of four-person homes and the concomitant new staffing patterns[,] . . . those adverse consequences [could not] be attributed to the transfer of a few discrete bargaining unit duties to non-unit personnel." Thus, the ALJ determined that the union had "failed to establish that the transfer of these duties ha[d] eroded the bargaining unit and caused substantial detriment to individual unit employees or the unit as a whole."

The union appealed to the commission. The commission af-

firmed so much of the ALJ's decision as held that the transfer of bargaining unit work was confined to the three specific duties set out above. The commission ruled, however, that the transfer did have an adverse impact on the union. It found that the union did not have to prove it lost RSII positions as a result of the transfer. Rather, the commission determined that "[a] transfer of bargaining unit work, accompanied by no apparent reduction in bargaining unit positions, [may nevertheless] constitute[] a detriment on the bargaining unit because it could result in an eventual elimination of the bargaining unit through gradual erosion of bargaining unit opportunities."

*Standard of review.* In reviewing the commission's decision, we "give due weight to the [agency's] experience, technical competence, and specialized knowledge . . . as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14. See *Commonwealth* v. *Labor Relations Commn.*, 404 Mass. 124, 127 (1989). The commission's decision must be based on substantial evidence — such evidence that "a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1(6). A reviewing court may not substitute its judgment for that of the commission, even "on the basis of evidence in the record that might have warranted a contrary conclusion." *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. 557, 573 (1983).

*Discussion.* The commission has long used a three-part test to determine whether a transfer of unit work is a mandatory subject of collective bargaining. In order to trigger the employer's obligation to engage in impact bargaining, the union must establish that (1) the employer transferred bargaining unit work to nonbargaining unit personnel; (2) the transfer of work had an adverse impact on either individual employees or on the bargaining unit itself; and (3) the employer did not provide the exclusive bargaining representative with prior notice and an opportunity to bargain over the decision to transfer the work. *Town of Bridgewater*, 25 M.L.C. 103, 104 (1998).

1. *Transfer of bargaining unit work.* The ALJ and the commission agree that bargaining unit work was transferred from RSIIs to PMIIIs. The department argues that because the RSIs in the four-person houses were filling the role formerly held by

the RSIIs, "the duties and responsibilities performed by the Program Managers had not changed" in that the PMs were still supervising residential supervisors in their roles as "house managers."

However, although witnesses at the hearing before the commission may have referred to RSIs as house managers, there is no official mention of the house manager position in documents setting out the residential supervisor series of positions. Nor is there mention of any such position in the correspondence between the union and the department concerning the matters at issue here. There was substantial evidence to support the commission's rejection of the department's analysis based on the role of house managers. Moreover, as the commission noted, the department failed to consider whether there were RSIIs who could have supervised the RSIs. The failure to explore these options violated G. L. c. 150E, § 10(*a*)(1) & (5). Therefore, we next consider whether the transfer of these functions had an adverse impact on the union.

2. *Adverse impact.* The commission correctly ruled that the transfer of bargaining unit work, even when accompanied by no apparent reduction in the total number of bargaining unit positions, constituted a detriment to the bargaining unit because it could result in the eventual elimination of the bargaining unit through gradual erosion of bargaining unit duties. See *Commonwealth of Massachusetts,* 24 M.L.C. 116, 119 (1998). There were fewer RSII positions to which an increased number of RSIs could aspire, including three vacant positions formerly occupied by RSIIs who had been laid off. See *City of Cambridge,* 23 M.L.C. 28, 36 (1996). The bargaining unit thus suffered an adverse impact when the opportunities for promotion to RSIIs were reduced. See generally *City of Boston,* 4 M.L.C. 1202, 1212 (1977); *City of Boston,* 6 M.L.C. 1117, 1121 (1979) (citing *Fibreboard Paper Prods. Corp.* v. *National Labor Relations Bd.,* 379 U.S. 203 [1964]); *Franklin School Comm.,* 6 M.L.C. 1297, 1299-1300 & n.4 (1979); *City of Gardner,* 10 M.L.C. 1218, 1220-1221 (1983) (citing *AMCAR Div., ACF Indus., Inc.* v. *National Labor Relations Bd.,* 596 F.2d 1344 [8th Cir. 1979]).

3. *Notice and an opportunity to bargain.* There seems to be no question that the department did not recognize its duty to

give the union notice of the change and an opportunity to bargain. That it had such a duty did not, contrary to the department's argument, require that it surrender its policy making function to the union. See *Worcester* v. *Labor Relations Commn.*, 438 Mass. 177, 185 (2002), citing *Burlington* v. *Labor Relations Commn.*, 390 Mass. 157, 164-167 (1983) (town could reassign duties formerly held by police prosecutors to town counsel, but required to bargain over impact on officers who lost pay). "The duty to bargain under G. L. c. 150E is a duty to meet and negotiate and to do so in good faith. G. L. c. 150E, § 6. Neither party is compelled, however, to agree to a proposal or to make a concession." *School Comm. of Newton* v. *Labor Relations Commn.*, 388 Mass. at 572.

*Conclusion.* On the whole, the commission's conclusion, based on its "experience, technical competence, and specialized knowledge," see G. L. c. 30A, § 14, is supported by the record and the case law. However, paragraphs 2(b) and 2(d) of the commission's order require modification. While the other paragraphs in the order appropriately emphasize the importance of notice and bargaining, paragraphs 2(b) and 2(d) suggest that the end result of the impact bargaining will be the restoration of certain duties to the bargaining unit, and require that the "Notice to Employees" so state. Pursuant to G. L. c. 150, § 11, the commission is empowered to restore the status quo ante temporarily. The permanent restoration of certain duties to the bargaining unit, however, is not part of the duty to meet and bargain in good faith.

Accordingly, the commission therefore shall modify paragraphs 2(b) and 2(d) to ensure that the order is consistent with this opinion. See *Sheriff of Worcester County* v. *Labor Relations Commn.*, ante 632, 644 (2004). We also note that the order in paragraph 2(c) to make bargaining unit members whole applies to the time period between the department's unilateral action and proper notice and an opportunity to bargain to resolution or impasse. In all other respects, the commission's order is affirmed.

*So ordered.*